UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO.: 05-61045-CIV-COOKE/BROWN

CHENET JOSEPH,

      Plaintiff,

v.

FLORIDA QUALITY TRUSS INDUSTRIES,
INC.,

      Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS CAUSE is before the Court upon Defendant's Motion for Summary Judgment (DE 41), filed October 10, 2006.  Plaintiff filed his opposition on October 30, 2006.  Defendant filed its reply on November 9, 2006.  The Court having reviewed the Motions finds, for the reasons set forth below, that Defendant's Motion for Summary Judgment should be granted.

### I.    BACKGROUND

### A.    ALLEGATIONS IN THE AMENDED COMPLAINT

Plaintiff instituted this employment discrimination action on June 27, 2005.  In his Amended Complaint, Plaintiff Chenet Joseph ("Plaintiff" or "Joseph") alleges that he was employed by Defendant Florida Quality Truss Industries, Inc. ("FQT") from January of 1991 to July of 2004.  Joseph avers that during the course of his employment, FQT and it's agents engaged in a pattern of continuous discrimination against him due to his Haitian national origin.  According to Joseph, FQT's alleged discriminatory acts altered the terms and conditions of his

-1-

employment and created a hostile work environment.  Additionally, Joseph avers that he was

terminated from his employment with FQT in retaliation for the filing of a charge of

discrimination.  Joseph asserts causes of action for national origin discrimination in violation of

42 U.S.C. § 1981; retaliatory discharge in violation of 42 U.S.C. § 1981; and violation of the

Florida Civil Rights Act ("FCRA").

### B.   CHARGES OF DISCRIMINATION

Attached as Exhibits A and B to Joseph's original Complaint were two charges of

discrimination which Joseph filed with the Florida Commission on Human Relations ("FCHR").

See Compl. Exs. A & B.  Joseph filed the first charge on November 25, 2003.  In the first charge,

Joseph alleged that FQT subjected him to discriminatory treatment in regards to wages and

vacation pay.  Compl. Ex. A.  Additionally, the charge alleges that FQT discriminatorily denied

Joseph a promotion to the position of saw man.[1]  Id.  Joseph filed the second charge on July 30,

2004.  In that charge, Joseph asserted a claim for retaliatory discharge.  Compl. Ex. B.

### II.   PROCEDURAL HISTORY

Defendant filed its Motion for Summary Judgment on October 10, 2006.  Plaintiff filed

his opposition on October 30, 2006.  Defendant filed its reply on November 9, 2006.  Thus,

Defendant's Motion for Summary Judgment is ripe for adjudication.

### III.   SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure summary judgment "shall

be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

---

[1] See infra note 6.

and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). According to the U.S. Supreme Court, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324. Thus, the nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). See, Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1984) (stating "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts"). However, the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).

**IV.**   **ANALYSIS**

In its Motion, FQT argues that it is entitled to summary judgment because: 1) a claim for discrimination based upon national origin cannot be asserted under 42 U.S.C. § 1981 ; 2) several of Joseph's claims are time barred; and 3) Joseph cannot prove a prima facie case of national origin discrimination.  The Court will address each of these contentions in turn.

**A.**   **JOSEPH'S LACK OF RECORD EVIDENCE**

Upon review of the record evidence and Joseph's opposition, it does not appear that Joseph engaged in any substantive discovery in this action.  In fact, beyond his own deposition testimony Joseph did not present any affidavits, declarations or other sworn testimony to elucidate or substantiate his allegations of discrimination.  Nevertheless, Joseph now contends that his failure to engage in discovery was due to FQT's failure to produce relevant deponents.  Opp. at 8 n.6.  This argument is insufficient and unavailing.  This case has been pending before this Court for more than one and a half years.  During this time period Joseph had ample time and opportunity to engage in discovery.  Further, if FQT had failed to provide adequate discovery then Joseph should have filed a motion to compel or sought other relief from this Court, however, Joseph failed to do so.  Moreover, this Court extended the discovery deadlines in this action to give Joseph additional time and opportunity to conduct the necessary discovery.  Yet, once again Joseph failed to engage in discovery.  As a result, the Court finds Joseph's belated contentions concerning discovery issuesto be disingenuous and untimely.[2]  Therefore, this Court

_____

[2]Joseph did not raise this issue with the Court until he filed his opposition to FQT's Motion for Summary Judgment on October 30, 2006 – approximately two months after this Court extended the fact discovery deadline in this matter.  See DE 33.  Additionally, it should be noted that this matter is set for trial on December 11, 2006.  See Scheduling Order (DE 11) issued September 27, 2005.  This impending trial date only further undermines Joseph's belated

will evaluate the merits of FQT's summary judgment arguments based upon the evidence

presented.

### B.    JOSEPH'S CLAIMS FOR DISCRIMINATION BASED UPON NATIONAL ORIGIN ARE NOT ACTIONABLE UNDER SECTION 1981

In its Motion, FQT argues that Joseph cannot assert a claim for discrimination based upon

national origin under 42 U.S.C. § 1981. Mot. at 5. Section 1981 provides the following:

> All persons within the jurisdiction of the United States shall have the same right
> in every State and Territory to make and enforce contracts, to sue, be parties, give
> evidence, and to the full and equal benefit of all laws and proceedings for the
> security of persons and property as is enjoyed by white citizens, and shall be
> subject to like punishment, pains, penalties, taxes, licenses, and exactions of every
> kind, and to no other.

42 U.S.C. § 1981. FQT is correct in its contention that a claim for discrimination based solely on

the claimant's place or nation of origin is not actionable under § 1981. Bedoya v. Hilti, Inc., No.

03-60327, 2004 WL 2857477 (S.D. Fla. Nov. 24, 2004) aff'd, 159 Fed.Appx. 91 (11th Cir.

2005). See St. Francis College v. Al-Khazraji, 481 U.S. 604, 613 (1987)); Faucette v. National

Hockey League, No. 04-2185T24EAJ, 2006 WL 213857, at *5 (M.D. Fla. Jan. 27, 2006).

Nevertheless, Joseph asserts the novel argument that his national origin claims are intertwined

with race such that the claims are actionable under § 1981. Specifically, Joseph states "[i]n

regard to the race analysis, Plaintiff is a Black Haitian. Haitians are a recognizably specific and

small group sharing very similar traits; color (Black) and ancestry (African). It is clear that they

are genetically part of an ethnically and physiognomically distinctive group." Opp. at 6.

Additionally, Joseph cites to Delly v. H.I.R.E., Inc., No. 04-1481(JG), 2004 WL 2297821 (E.D.

N.Y. Oct. 13, 2004) for the proposition that a Haitian plaintiff can prove a racial discrimination

_____

discovery contentions.

case under § 1981 despite the fact that the complaint only referenced national origin.  However, the Court finds Joseph's arguments to be unavailing.

The Court recognizes that ethnic and racial groupings are constantly evolving, however, it is not within this Court's competency to review the empirical research necessary to determine when the exception Joseph presents should be applied.  Moreover, if the Court adopted Joseph's novel analysis then a multitude of national origin claims could be interpreted to encompass claims for racial/ethnic discrimination thereby undermining the distinction between national origin and racial/ethnic discrimination claims.  National origin and racial/ethnic discrimination claims are distinct claims.  National origin claims encompass scenarios where an individual has been discriminated against based upon that person's *nation or place of origin*.  However, racial/ethnic discrimination claims encompass scenarios where an individual has been discriminated against because they are a member of a specific *ethnic or racial* group which is not necessarily associated with or limited to that person's nation or place of origin.  See Bedoya, 2004 WL 2857477, at * 3.  See also, St. Francis College, 481 U.S. at 613.  Therefore, the Court cannot equate these claims.

Secondly, Joseph's reliance upon Delly v. H.I.R.E., Inc., No. 04-1481(JG), 2004 WL 2297821 (E.D. N.Y. Oct. 13, 2004) is misplaced.  Delly was decided at the motion to dismiss phase where the plaintiff only had to state a claim upon which relief could be granted.  Consequently, in its holding the Delly court reasoned "[b]ecause of the often subtle overlap of race and national origin, however, I cannot say, as a matter of law, that some portion of the discrimination that Mr. Delly allegedly faced was not based upon race. . . Accordingly, Delly's § 1981 claim is construed as one alleging discrimination based, at least in part, upon race, and the

-6-

motion to dismiss the § 1981 claim is denied." Id. at *7. But the case at bar is at the summary judgment stage, therefore, to carry his burden Joseph must provide evidence to establish that his § 1981 claims are based upon racial/ethnic discrimination. See Fed.R.Civ.P. 56. However, Joseph has failed to meet this burden. In fact, Joseph did not present this Court with any evidence which could establish a claim for racial/ethnic discrimination under § 1981. At best, the evidence Joseph presented may support a claim for discrimination based upon national origin. For instance, Joseph proffered the following deposition testimony to establish that he was discriminated against with regard to paid vacations:

> Joseph:    I know they paid for him and I also know that they paid for Ben's vacation also because he told me. And then me I always ask that question, how come I never get paid for vacation? And I don't even ask the question. Not me. Them, they ask how come you never get paid for vacation? There was another guy there, a Turkish guy, his name was Sadat. I talked to him and I asked him that question and he said, well its because you are Haitian.

Joseph Dep. at 100-101. The above testimony does not suggest or allege that Joseph suffered any form of discrimination based upon his race or ethnicity. Moreover, Joseph's deposition is rife with similar testimony in which he alleges that he was discriminated against based upon his Haitian national origin not his race or ethnicity. See Joseph Dep. However, as previously discussed, § 1981 does not encompass claims for discrimination based upon national origin.[3]

Bedoya, 2004 WL 2857477, at * 7; See St. Francis College, 481 U.S. at 613.

_____

[3] This opinion should not be viewed as precluding those of Haitian descent from bringing a race or ethnicity based claim under § 1981. In fact, § 1981 is the appropriate vehicle for such claims. See St. Francis College, 481 U.S. at 613. However, in the present action Joseph did not bring a race or ethnicity based claim. Instead, Joseph's claims are based upon his national origin not his race or ethnicity. See supra pp 5-7. Therefore, Joseph's claims are not actionable under § 1981.

Finally, Joseph contends that this Court should find his claims to be racial discrimination claims because in his first charge of discrimination he marked the box labeled race. Opp. at 6. However, this argument is also unavailing. In his Complaint and Amended Complaint, Joseph asserted allegations of discrimination based upon national origin not race. In fact, nowhere in either the Complaint or the Amended Complaint did Joseph assert a claim for racial discrimination. See Compl. and Amended Compl. Thus, while Joseph may have asserted a claim for racial discrimination in the first charge of discrimination it appears that Joseph chose to forego that claim when he filed his Complaints with this Court. The Court is not in a position to divine what claims a plaintiff wishes to assert. Instead, the burden rests with the plaintiff to set forth those claims in his complaint. See Fed.R.Civ.P. 8(a). To hold otherwise would drastically undermine the pleading notice requirement set forth in Rule 8(a) of the Federal Rules of Civil Procedure and unfairly burden defendants as they would no longer receive adequate notice of the claims being asserted against them. Therefore, the Court finds that Joseph's § 1981 claims are not actionable.

## C.   FCRA STATUTE OF LIMITATIONS

The FCRA's stated purpose is "to secure for all individuals within the state freedom from discrimination because of race, color, religion, sex, national origin, age, handicap or marital status." See Woodham v. Blue Cross and Blue Shield of Florida, Inc., 829 So.2d 891, 894 (Fla.2002) (citing Fla. Stat. § 760.01(2) (1999)). As a prerequisite to bringing a civil action based upon an alleged violation of the FCRA, a claimant must first file a complaint with the Florida Commission on Human Relations ("FCHR") within 365 days of the alleged violation. See Woodham, 829 So.2d at 894 (citing Fla. Stat. § 760.11(1) (1999)). Claimants are barred

-8-

from pursuing FCRA claims which fall outside of the 365 day statute of limitations period.  <u>See</u>

<u>Collins v. Miami-Dade County</u>, 361 F.Supp.2d 1362, 1378-79 (S.D. Fla. 2005).[4]

> **1.    JOSEPH'S CLAIMS CONCERNING ALLEGED DISCRIMINATORY TREATMENT SUFFERED AFTER AN ALLEGED WORK RELATED INJURY ARE TIME BARRED**

Joseph contends that FQT discriminated against him based upon his national origin

because FQT did not pay for his medical treatment for a work related injury, while it paid for a

non-Haitian employee's medical treatment for a non-work related injury.  Joseph Dep. at 100.

FQT argues that Joseph's claims concerning the alleged discriminatory manner in which it

treated Joseph's purported work related injuries are time barred pursuant to the FCRA's statute

of limitations.  Mot. at 5.  This Court agrees.

Joseph filed his charge of discrimination with the FCHR on November 25, 2003.  <u>See</u>

Compl. Ex. A.  Therefore, any claims occurring prior to November 25, 2002 are time barred

under the FCRA.  At his August 18, 2006 deposition, Joseph testified that the alleged work

related injury occurred "maybe six or seven years ago."  Joseph Dep. at 115.  Thus, Joseph

indicated that the alleged work related injury occurred prior to November 25, 2002.  Moreover, in

his opposition Joseph failed to address this issue or direct this Court to any evidence to support

the contention that this claim is not time barred.  <u>See</u> Opp.  Therefore, the Court finds that

Joseph's FCRA claims concerning FQT's alleged discriminatory treatment of his medical claims

are time barred.

---

[4]The FCRA is patterned after Title VII; therefore, federal case law dealing with Title VII is applicable to cases brought under the FCRA.  <u>See</u> <u>Maniccia v. Brown</u>, 171 F.3d 1364, 1368 n. 2 (11th Cir. 1999); <u>Florida State Univ. v. Sondel</u>, 685 So.2d 923, 925 n. 1 (1996).

2.    **JOSEPH'S CLAIM CONCERNING FTQ'S ALLEGED DISCRIMINATORY REFUSAL TO GIVE HIM A RAISE IS TIME BARRED**

At his deposition, when asked why else he believed that FQT had discriminated against him based upon his national origin Joseph stated:

> I remember back in 1996 when I became a U.S. citizen, and then I went to Mr. Tolga's office as he was doing the payroll.  So I said, well, now you're going to pay me more money because now I'm a U.S. citizen, but he said, more welfare.

Joseph Dep. at 109.  Based upon this testimony, it appears that Joseph is attempting to assert a claim for FTQ's alleged discriminatory actions in refusing to give him a raise after he became a U.S. citizen.[5]  See Joseph Dep. at 109.  However, this claim is time barred because the alleged incident occurred more than 365 days before Joseph filed a charge of discrimination with the FCHR.  As previously discussed, the FCRA requires that a claimant file a complaint with the Florida Commission on Human Relations ("FCHR") within 365 days of the alleged violation.  See Woodham, 829 So.2d at 894 (citing Fla. Stat. § 760.11(1) (1999)).  In his deposition, Joseph stated that the alleged discriminatory act occurred in 1996 but he did not file a charge of discrimination with the FCHR until November 25, 2003 – approximately six years after the alleged incident occurred.  Therefore, this claim is time barred.

3.    **JOSEPH'S FAILURE TO PROMOTE CLAIMS ARE TIME BARRED**

In his deposition and charge of discrimination, Joseph appears to assert a claim for failure to promote.  See Joseph Dep.; Compl. Ex. A.  For instance, when asked if there were any other reasons why he believed he had been discriminated against based upon his national origin,

---

[5]In his Complaint, Joseph did not elucidate his discrimination claim based upon FQT's alleged failure to give him a raise.  Further, Joseph's opposition did not address or clarify this claim.  Therefore, this Court was forced to scour Joseph's deposition in order to illuminate the parameters of this claim.

Joseph stated "Okay.  Again, he didn't want to give me any promotion or any position that I ask [sic]."  Joseph Dep. at 110.  Based upon a review of his deposition, it appears that the promotion which Joseph allegedly sought was for the position of saw man.  Id. at 70, 72, 101.[6]  FQT presented this Court with uncontroverted evidence which establishes that during Joseph's employment with FQT there were only two openings for a saw man position, one in February 2001 and one in February 2004.  Adak Aff. at ¶ 26; Santoyo Aff. at ¶ 19.  Additionally, Tolga Adak (the co-owner and Vice President of FQT) and Jose Santoyo (a foreman with FQT who served as Joseph's supervisor) both stated in their Affidavits that the 2001 saw man promotion was given to Alejandro Altuzar in approximately February of 2001 because he expressed more interest in the position than did Joseph.  Id.  Further, Adak and Santoyo stated that the 2004 saw man promotion was given to Joseph in February of 2004.  Id.  Importantly, Joseph did not present any evidence to controvert the Affidavits of Adak and Santoyo.  See Opp.  Instead, Joseph requested that this Court disregard or draw dubious inferences from the fact that FQT relied upon the Affidavits of those in managerial positions to support its motion.  However, following Joseph's logic would result in the improper shifting of the burden in this action, which the Court declines to do.[7]  Consequently, the Court finds that Joseph's failure to promote claim with regard

---

[6]In his charge of discrimination, Joseph indicated that the position he was discriminatorily denied promotion to was that of foreman.  Compl. Ex. A.  But in his deposition he stated that the position he was discriminatorily denied promotion to was that of saw man.  See Joseph Dep. at 72, 76.  Additionally, in his deposition, Joseph suggested that the charge of discrimination incorrectly labeled the position as foreman.  Id.

[7]Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.  The nonmoving party "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty

to the 2001 saw man position is time barred as it occurred more than 365 days before Joseph

filed a charge of discrimination with the FCHR.  See Woodham, 829 So.2d at 894 (citing Fla.

Stat. § 760.11(1) (1999)).  Further, given that Joseph received the promotion for the 2004 saw

man position, the only other saw man position opening, the Court finds that Joseph has failed to

establish a basis for his failure to promote claims.  Therefore, summary judgment shall be entered

in FQT's favor with regard to Joseph's failure to promote claims.

### D. JOSEPH CANNOT PROVE A PRIMA FACIE CASE OF NATIONAL ORIGIN DISCRIMINATION UNDER THE FCRA[8]

Based upon Joseph's Complaint, he has alleged that FQT engaged in a disparate

treatment form of discrimination.  See Amended Compl.  In disparate treatment cases, a plaintiff

must prove that the defendant acted with discriminatory purpose.  Nix v. WLCY Radio/Rahall

Communications, 738 F.2d 1181, 1184 (11th Cir.1984).  Direct evidence of discriminatory

animus can be difficult to produce, therefore, it is often appropriate to analyze circumstantial

evidence of discrimination according to the three-step procedure first developed in McDonnell

Douglas Corp. v. Green, 411 U.S. 792 (1973).  Nix, 738 F.2d at 1184.  "Under that procedure,

the plaintiff must create an inference of discrimination by establishing a prima facie case.  If he

does so, the defendant must 'articulate some legitimate, nondiscriminatory reason for the

employee's rejection.'"  Id. (quoting McDonnell Douglas, 411 U.S. at 802).  The plaintiff may

then attempt to show that the employer's proffered reasons are pretextual or may present other

_____

Lobby, Inc., 477 U.S. 242, 248 (1986).

[8]In resolving this issue, the Court will rely upon FCRA caselaw as well as Title VII
caselaw.  See Harper v. Blockbuster Entm't Corp., 139 F.3d 1385, 1387 (11th Cir.1998) (holding
that federal case law construing Title VII is persuasive authority for interpretation of the FCRA,
because the FCRA mirrors and is patterned after Title VII).  See supra note 4.

-12-

evidence to show that discriminatory intent was more likely the cause of the employer's actions.

Nix, 738 F.2d at 1184; Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981).

The burden of establishing a prima facie case of disparate treatment is not onerous. See Burdine, 450 U.S. at 253.  Generally, a prima facie case of disparate treatment is established where the complainant shows: (1) that he belongs to a protected class; (2) that he suffered an adverse employment action; (3) that he and a similarly situated non-protected person were dissimilarly treated; and (4) that the employment action was causally related to the protected status.  See, Perkins v. School Board of Pinellas County, 902 F.Supp. 1503, 1506-7 (M.D.Fla.1995); Wilson v. B/E Aero., Inc., 376 F.3d 1079, 1087 (11th Cir.2004) ("A plaintiff establishes a prima facie case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class.  The methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation").

In his deposition, Joseph alleged that FQT discriminated against him by failing to give him paid vacation while it gave paid vacations to non-Haitian employees.  For instance, Joseph stated:

> There is that guy Murat that I work with, every year he gets one month vacation.  When he's not there I'm the only one there working doing all jobs . . . I know they paid for him and I also know that they paid for Ben's vacation also because he told me.  And then me I always ask that question, how come I never get paid for vacation?  And I don't even ask the question.  Not me.  Them, they ask how come you never get paid for vacation?  There was another guy there, a Turkish guy, his name was Sadat.  I talked to him and I asked him that question and he said, well, it's because you are Haitian . . . I was asking him, I said how come whenever I ask for the position that I wanted, saw man, also paid vacation, I ask him why?  That's what he said . . .Ben is my friend, and then he told me at one point he missed a full week he thought he would not get paid for that.  When he came back they said, here.  Here's your check for the whole week.  Murat gets paid his vacation

-13-

also normally.  The same for Ben.  He said he gets paid vacation.

Joseph Dep. at 100-101, 110.  Beyond his own conclusory deposition testimony, Joseph did not present any other evidence to substantiate his claims that non-Haitian employees received paid vacations.  Specifically, Joseph did not present this Court with wage records showing that non-Haitian employees received paid vacations or sworn testimony from Sadat, Murat, Ben or any of the other employees who Joseph claims received paid vacations.  Thus, it appears that Joseph is attempting to establish a prima facie case of discrimination by relying upon his own conclusory allegations.  However, this is insufficient to defeat a motion for summary judgment.  See Celotex Corp., 477 U.S. 317, 323-24.  Further, Joseph's deposition testimony constitutes inadmissible hearsay as it is rife with out-of-court statements offered for the truth of the matter asserted.  See Pritchard v. Southern Co. Services, 92 F.3d 1130, 1135 (11 Cir. 1996) ("Pritchard cannot use inadmissable hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial"); Macuba v. Deboer, 193 F.3d 1316, 1323-25 (11th Cir. 1999); Stadium Book & Video, Inc. v. Miami Dade County, No. 04-21156, 2006 WL 2374740, at * 28-29 (S.D. Fla. Jul. 31, 2006).  Therefore, Joseph's deposition testimony is insufficient to establish a prima facie case of disparate treatment.

Moreover, FQT presented the Affidavits of Adak and Santoyo which indicate that FQT does not offer paid vacation to any of its employees.  See Adak and Santoyo Affs.  In his Affidavit, Mr. Adak stated "FQTI does not provide paid vacations to its employees.  If FQTI employees want to take time off from work for vacations, they must take an unpaid leave.  Requests for unpaid leave are evaluated based on FQTI's business needs at the time."  Adak Aff. at ¶ 36.  Similarly, Mr. Santoyo stated "I am unaware of any employees who have ever received

-14-

paid vacation.  I have no record of Murat Efe, who is Turkish, or Benjamin Quinn, who is African American, ever receiving a paid vacation while at FQTI."  Santoyo Aff. at ¶ 25.  Notably, Joseph did not present any evidence to rebut FTQ's Affidavits.  Therefore, after reviewing the record evidence the Court finds that Joseph has failed to establish a prima facie case of discrimination with regard to paid vacation time.

### E.   JOSEPH'S HOSTILE WORK ENVIRONMENT CLAIM FAILS

#### 1.   JOSEPH FAILED TO EXHAUST ADMINISTRATIVE REMEDIES WITH REGARD TO HIS HOSTILE WORK ENVIRONMENT CLAIM

In his opposition, Joseph attempts to argue that his discrete discrimination claims, regardless of whether they are time barred, serve to show a pattern of adverse differential treatment to support a claim for hostile work environment.  Opp. at 7-11.  FQT counters that Joseph failed to assert a hostile work environment claim in his charge of discrimination and is therefore barred from asserting the claim at this juncture.  The Court agrees with FTQ's argument.

Prior to filing a Title VII/FCRA action, a plaintiff first must exhaust his administrative remedies by filing a charge of discrimination with the EEOC/FCHR.  Gregory v. Ga. Dep't of Human Res., 355 F.3d 1277, 1279 (11th Cir.2004).[9]  A plaintiff's judicial complaint is limited by the scope of the EEOC/FCHR investigation that "can reasonably be expected to grow out of the charge of discrimination."  Gregory, 355 F.3d at 1280 (citations omitted).  See Jackson-Levarity v. Dep't of Children and Families, No. 02-CA 27, 2003 WL 21704323, at * 3 (Fla. Cir. Ct. Mar.

---

[9]As previously noted, the FCRA is patterned after Title VII, consequently, Florida courts have established that federal caselaw governing Title VII is applicable to cases brought under the FCRA.  See Champion Intern. Corp. v. Wideman, 733 So.2d 559, 563 n.1 (Fla. Dist. Ct. App. 1999).

7, 2003).  However, "the scope of an EEOC complaint should not be strictly interpreted."

Gregory, 355 F.3d at 1280.  In order to establish a hostile work environment claim, the plaintiff

must show that "the workplace is permeated with 'discriminatory intimidation, ridicule, and

insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment

and create an abusive working environment.'"  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21

(1993) (citations omitted).

In the present action, Joseph has not pointed to any allegations in his FCHR charges that

could reasonably be construed as suggesting the kind of pervasive and oppressive conditions that

would allow this Court to conclude that he intended for the FCHR to investigate the workplace

for a hostile work environment claim.  Further, this Court has reviewed the charges and finds that

Joseph failed to assert a claim for hostile environment.  For instance, Joseph's first charge of

discrimination states:

> While employed with the Respondent, I was subjected to differential treatment in
> regards to working with no assistance, wages, and vacation pay.  In addition, I was
> passed over for promotions to the position of Foreman.[10]  I have been employed
> since 1991.  I am Haitian.

Compl. Ex. A.  Similarly, Joseph's second charge of discrimination fails to suggest a hostile

work environment claim.  Instead, the second charge only asserts a claim for retaliatory

discharge.  The second charge states:

> In July 15, 2004, I was discharged from my position.  I filed a Charge of
> Discrimination against the Respondent on November 25, 2003.  The Respondent
> retaliated against me because I filed a Charge of Discrimination against them
> based on my National Origin, Haitian. . . Respondent told me 'If I did not like it, I
> was fired'; after I complained about a work assignment.

---

[10]See supra note 6.

-16-

Compl. Ex. B.  Thus, while Joseph's charges of discrimination assert allegations of discrete acts

of discrimination (including failure to promote, discriminatory pay, and retaliatory discharge)

these charges do not assert allegations of harassment such that an investigation for hostile work

environment could reasonably be expected to grow out of the charges.  See Sanchez v. Standard

Brands, Inc., 431 F.2d 455, 465-66 (11th Cir. 1970); Gregory, 355 F.3d at 1280 (citations

omitted).  Therefore, the Court finds that Joseph has failed to exhaust his administrative remedies

with regard to his hostile work environment claims.

### 2. JOSEPH FAILED TO ESTABLISH A CLAIM FOR HOSTILE WORK ENVIRONMENT

However, even if this Court were to conclude that Joseph's hostile work environment

claim was not procedurally barred, the claim would still fail because Joseph did not proffer

sufficient evidence to support the claim.  Joseph attempts to establish a claim for hostile work

environment based upon the alleged adverse treatment he received while employed with FQT.

Specifically, Joseph's contends that he was treated adversely because:[11]

- he was not promoted

- he did not receive paid vacations

- he did not receive pay raises

- he did not receive medical benefits for his purported work related injury

- he did not receive assistance on work projects

- he was terminated without first receiving warnings or write-ups

Opp. at 8-10.  Additionally, Joseph argues that while employed with FQT "he was being

---

[11]It should be noted that Joseph only relies upon his own deposition testimony to support these claims.  See Opp. 8-10; Joseph Dep. at 66, 67,70, 71, 100, 101, 109, 110, 115, 132-33.

subjected to offensive comments and derogatory statements about his being Haitian by co-workers, immediate supervisor, and management." Id. at 8.  Upon review, the Court finds these arguments to be unavailing.  As previously discussed, Joseph's brief is rife with conclusory allegations which are devoid of evidentiary support other than the conclusory unsupported (and often inadmissible hearsay) statements contained within Joseph's own deposition.  However, even if this Court were to ignore the deficiencies inherent within Joseph's offer of proof the Court still must find that Joseph has failed to present sufficient evidence to establish an actionable claim for hostile work environment.

As previously discussed, a hostile work environment claim under Title VII/FCRA is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  Harris v. Forklift Systems, Inc., 510 U.S. at 21-22.  The Eleventh Circuit has held that "a plaintiff wishing to establish a hostile work environment claim must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or direct liability."  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  The U.S. Supreme Court has held that the severe and pervasive requirement of a Title VII claim has both an objective and subjective component.  Thus, to be actionable the behavior must result in both an environment that a reasonable person

would find hostile or abusive and an environment that the victim subjectively perceives to be abusive. Id. at 1276 (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).

In evaluating the objective severity of the alleged harassment courts consider (among other factors): (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. Miller, 277 F.3d at 1276 (citing Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997)). Additionally, the Eleventh Circuit has instructed that in determining whether an environment is sufficiently hostile or abusive courts should examine the conduct in context and evaluate the totality of the circumstances. See Miller 222 F.3d at 1276 (citing Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999)). However, the mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to implicate Title VII. Miller 277 F.3d at 1276-77 (citing Harris, 510 U.S. at 21). Thus, to be actionable the conduct must rise above the level of off-handed comments made in the course of casual conversation. See Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (1998) (recognizing that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment).

With regard to his claims that he was subject to derogatory insults Joseph only cited to two alleged incidents. The first alleged incident involved a co-worker allegedly explaining to Joseph that he received adverse treatment because he was Haitian. See Joseph Dep. at 101; See supra p. 13. The second alleged incident involved Mr. Santoyo's alleged comments concerning Joseph's newly attained U.S. citizenship status. Specifically, Joseph alleged that when he

-19-

informed Mr. Santoyo that he had become a U.S. citizen Mr. Santoyo inferred that Joseph's attainment of U.S. citizenship would result in a numerical increase to the welfare rolls.  See Joseph Dep. at 109; See supra p. 10.  The Court recognizes that the above alleged comments are inappropriate, crass, and boorish.  However, to be actionable under Title VII and the FCRA the alleged comments must rise above the level of off-handed stupid and offensive comments.  Again, the Eleventh Circuit has instructed that Title VII is only implicated in the case of a workplace that is permeated with discriminatory intimidation, ridicule, and insult, not where there is a mere utterance of an epithet.  Miller 277 F.3d at 1277 (citations omitted).  For instance, in Miller, the Eleventh Circuit concluded that the plaintiff had set forth sufficient evidence to establish an actionable Title VII claim where the plaintiff, a Mexican-American, presented evidence demonstrating that his co-workers frequently shouted derogatory names at him in an intimidating manner during the course of berating him for his job performance or when they were arguing with or otherwise upset with him.  Id. at 1277.  Further, in Miller the Eleventh Circuit noted that the very nature of the of the of the derogatory remarks coupled with the fact that they were directed at the plaintiff often in the course of reprimanding him established that the derogatory names and remarks were degrading and humiliating.  Id.  Additionally, this Court is cognizant of the U.S. Supreme Court's admonishment in Faragher that off handed boorish comments made during casual conversation are insufficient to serve as a basis for a Title VII claim.  Faragher, 524 U.S. at 788 ("A recurring point in these opinions is that 'simple teasing,'. . .offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment'") (citing Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 82 (1998)).  See Miller, 277 F.3d at 1276-77.  Moreover, when examined in context

and viewed under the totality of the circumstances the Court finds that Joseph has failed to

establish that the alleged discriminatory comments as well as the allegations that he received

differential treatment (with regard to promotions, pay, medical benefits, paid vacation, and

termination)[12] were sufficiently severe or pervasive to establish a claim for hostile work

environment.  See e.g. Mendoza, 195 F.3d 1238 (11th Cir. 1999).  Specifically, Joseph failed to

establish that the alleged conduct: 1) occurred on a frequent basis; 2) was severe; 3) involved

physical threats and/or humiliation; or 4) unreasonably interfered with his job performance.

Miller, 277 F.3d at 1276.  Therefore, the Court finds that Joseph has failed to establish a claim

for hostile work environment.

### G.   JOSEPH'S RETALIATION CLAIMS FAIL

In his Complaint, Joseph asserts a claim for retaliatory discharge in violation of 42 U.S.C.

§ 1981.  In its reply, FQT argues that this claim fails as a matter of law because claims for

national origin discrimination cannot be brought under § 1981 and therefor a claim for retaliatory

discharge based upon national origin discrimination in violation of § 1981 is not cognizable.

Notably, FQT did not provide any caselaw to support this position.  Further, this Court conducted

its own independent research but was unable to find caselaw or other authority to support FQT's

argument.  Therefore, the Court will address the merits of Joseph's retaliatory discharge claim.

To establish a prima facie case of retaliation under Title VII and the FCRA a plaintiff

must show "that (1)[he] engaged in . . . statutorily protected expression; (2)[he] suffered an

---

[12]As previously discussed, many of these allegations are conclusory and unsupported by the record evidence in this action.  Additionally, much of the minimal record evidence which Joseph relied upon to support the allegations is inadmissable as it is rife with hearsay.  See supra pp 13-14.

adverse employment action; and (3) there is a causal [connection] between the two events."
Shannon v. Bellsouth Telecommunications, Inc., 292 F.3d 712, 715 (11th Cir. 2002) (citing

Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir.2000)); Guess

v. City of Miramar, 889 So.2d 840, 846 (Fla. Dist. Ct. App. 2004).  If a plaintiff makes out a

prima facie case of retaliation, the burden then shifts to the defendant to produce legitimate

reasons for the adverse employment action.  Shannon, 292 F.3d at 715.  "If the defendant does

so, the plaintiff must show that the reasons the defendant gave were pretextual."  Id. (citations

omitted).  In the present action, Joseph argues that he suffered an adverse employment action

after filing his charge of discrimination because: 1) his co-workers refused to assist him on work

assignments; and 2) he was terminated without warning or reprimand.  However, the Court finds

Joseph's argument to be unpersuasive.

### 1.    COWORKERS' REFUSAL TO ASSIST ON WORK PROJECTS[13]

To support his contention that his co-workers refused to assist him on work assignments

Joseph directed this Court to examine his deposition testimony.  The deposition colloquy in

question states the following:

Q:          Did you go to the office to speak with Mr. Tolga?

Joseph:     Yes.

Q:          Were you upset?

Joseph:     Yes.

---

[13]Because the Court finds that the alleged actions of Joseph's co-workers are insufficient to establish a prima facie claim of retaliation under the FCRA, the Court will not address the issue of whether the co-workers' alleged actions may be imputed to FTQ (the employer) for purposes of a retaliation claim.

Q:        Why were you upset?

Joseph:      It's because as soon as I got the position at work the guys were not too happy because I got a position that they felt was to their friends, that belonged to their friends, and then they refused to work with me.

Q:        What position did you receive at work?

Joseph:      Saw man.

Q:        When did you receive that position?

Joseph:      I don't [sic.]. It was for a couple of months but I can't remember the exact month.

Q:        Do you recall if it was before or after you filed your first Charge of Discrimination in November of 2003?

Joseph:      I can't remember between the two dates.

Q:        How did you know that they were upset that you had been promoted into that position?

Joseph:      Okay as soon as I got the promotion, I mean the position, they don't want to work. I even complained to Mr. Tolga's brother, Guney Adak, because Mr. Tolga wasn't there.

Q:        When did you make that complaint?

Joseph:      No [sic].

Q:        When did you make that complaint to Tolga's brother?

Joseph:      Well, the day that it happened. The job I do it involves three saw men, three big saw men. If one is not working and then everybody else that depends on us doing that job, they have problems. And then they come to me to ask explanation. So I went to see Mr. Guney and then he told them to go back to work and they started working. And then they started again. And then the next day when I came to work, they all sat down doing nothing. At that point I called the foreman, I showed him what was happening. He was even angrier than men. And then he said, okay, come with me to the office to talk. So when I went and I arrive at the office, Mr. Tolga ask, he ask me do you still want to work in this company?

-23-

Q:    I'm sorry.  I think Mr. Joseph may have misunderstood my question. Allow me to ask again.

Joseph:  Okay.

Q:    When did you speak to Tolga's brother to complain that people were upset that you had been promoted to a saw man position?

Joseph:  What do you mean by when or the date?

Q:    I mean the date.

Joseph:  Well, if I go and talk to anybody at the office I'm not going to write down the date that I did talk to that person.

Q:    Was it in the last year of your employment?

Joseph:  Yeah as soon as I got promoted.

Q:    Were you promoted in your last year of employment?

Joseph:  It started in February and it ended in July, but I don't remember exactly the right date.

Q:    What started in February?

Joseph:  The promotion that I got.

Q:    So you were promoted in February of what year?

Joseph:  2004.  In February but I don't know the exact date.

Q:    That's fine.  Thank you.  You were promoted in February 2004 to the saw man position?

Joseph:  Well, I remember it was in February that they had called me to talk to me about that promotion.  But when I started the position I can't remember the exact month.  It could be February or maybe March because I didn't stay in that position for long.

Joseph Dep. 66-69.  Thus, in his deposition Joseph identified two specific incidents, which

occurred around February or March of 2004, where his co-workers allegedly refused to assist him

on work assignments.  See id.  However, it does not appear that the alleged incidents are sufficient to establish that Joseph suffered an adverse employment action.

The Eleventh Circuit has established that an adverse employment action is not limited to ultimate employment decisions, such as the decision to discharge an employee.  Wideman v. Wal-Mart Stores, Inc., 141 F.3d 1453, 1456 (11th Cir.1998).  Employer conduct falling short of an ultimate employment decision may still be cognizable under Title VII if it reaches "some threshold level of substantiality."  Id.  There is no bright line test to determine whether an action is sufficient to constitute an adverse employment action for purposes of a retaliation claim.  Davis v. Town of Lake Park, Fla., 245 F.3d 1232, 1238 (11th Cir. 2001).  Instead, actions must be evaluated on a case-by-case basis.  But the Eleventh Circuit has cautioned that "Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace."  Id. at 1239 (citations omitted).  Thus, not all conduct by an employer negatively affecting an employee constitutes adverse employment action.  See id. at 1238-1239.  Moreover, in Davis the Eleventh Circuit stated:

> Whatever the benchmark, it is clear that to support a claim under Title VII's anti-discrimination clause the employer's action must impact the "terms, conditions, or privileges" of the plaintiff's job in a real and demonstrable way. Although the statute does not require proof of direct economic consequences in all cases, the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment. We therefore hold that, to prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a serious and material change in the terms, conditions, or privileges of employment. Moreover, the employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances.

Id. at 1239.  Additionally, the caselaw in this Circuit is rife with decisions in which employers' actions, which were more substantial than those at issue in the case at bar, were found to be

insufficient to establish an adverse employment action.  See e.g. Davis, 245 F.3d at 1240-1246

(holding that an employer's placement of negative job performance memoranda in an employee's

personnel file and changes to the employee's work assignments did not constitute adverse

employment actions); Gonzalez v. florida Dept. of Highway Safety and Motor Vehicles Div., 237

F.Supp.2d 1338, 1348 (S.D. Fla. 2002) (an employer's failure to transfer an employee to a

different shift does not constitute an adverse employment action where employee did not allege

that the transfer would result in an increase in pay, prestige, or responsibility); Johnston v.

Henderson, 144 F.Supp.2d 1341, 1357-59 (S.D. Fla. 2001) (holding that improper denial of sick

leave, unauthorized release of confidential medical records, issuance of unfounded notice to

report questioning employee's leave of absence from duty, unspecified allegation of harassment,

improper filing of insurance forms, improper alteration of worker's compensation records,

institution of an unfounded collection action, and incorrect processing of FMLA forms did not

constitute adverse employment action).  Therefore, the Court finds that Joseph's allegations that

his co-workers refused to assist him on work assignments are insufficient to show that he

suffered a serious and material change in the terms, conditions, or privileges of employment.  See

Davis, 245 F.3d at 1239.

Moreover, even if this Court were to find that Joseph's co-workers' refusal to assist him

on work projects constituted an adverse employment action Joseph has failed to establish a

causal connection between the filing of his charge of discrimination and his co-workers' alleged

refusal to assist him on work assignments.  "To establish a causal connection, a plaintiff must

show that the decision-makers were aware of the protected conduct, and that the protected

activity and the adverse actions were not wholly unrelated."  Shannon, 292 F.3d at 716 (citing

Gupta v. Florida Bd. of Regents, 212 F.3d 571, 590 (11th Cir. 2000)).  "Close temporal

proximity between the protected activity and the adverse action may be sufficient to show that

the two were not wholly unrelated."  Shannon, 292 F.3d at 716-717 (citing Bass, 256 F.3d at

1119).  The cases accepting mere temporal proximity between an employer's knowledge of

protected activity and the employer's alleged retaliatory action as sufficient evidence of causality

to establish a prima facie case uniformly hold that the temporal proximity must be very close.

Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001).  The U.S. Supreme Court has

cited with approval decisions in which a three to four month disparity was found to be

insufficient to establish a causal connection.  See id. (citing Richmond v. ONEOK, 120 F.3d 205,

209 (10th Cir.1997); Hughes v. Derwinski, 967 F.2d 1168, 1174-75 (7th Cir.1992)).  Thus, if

there is a substantial delay between the protected expression and the alleged retaliatory conduct,

then, in the absence of other evidence tending to show causation, the complaint fails as a matter

of law.  Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir.2004).

    As previously discussed, Joseph filed his initial charge of discrimination on November

25, 2003.  In his deposition testimony, Joseph asserted that he received the alleged adverse

employment action from co-workers after he received his promotion in February or March of

2004.  Joseph Dep. at 68-69.  Thus, the alleged adverse employment action did not occur until

approximately three to four months after he filed the charge of discrimination.  Therefore, the

Court finds that Joseph has failed to establish sufficient temporal proximity between the filing of

the charge of discrimination and the alleged adverse treatment from his co-workers to establish a

causal connection.  See Clark County Sch. Dist., 532 U.S. at 273-274; Higdon, 393 F.3d at 1220-

21.  Moreover, in his deposition, Joseph indicated that the adverse treatment he allegedly

received from his co-workers was due to his promotion to saw man.  <u>See</u> <u>id</u>. at 66-69.  Thus,

Joseph's own deposition testimony suggests that the cause of the alleged adverse treatment was

petty workplace jealousy not the filing of the charge of discrimination.  <u>Id</u>.  Further, Joseph did

not provide this Court with any other evidence which shows a causal connection between the

alleged adverse employment action and the filing of the charge of discrimination.  <u>See</u> Opp.  In

fact, Joseph did not cite to any evidence beyond the deposition colloquy quoted above.

Therefore, the Court finds that Joseph has failed to establish a causal connection between the

protected expression and the alleged adverse employment action.

### 2.    <u>RETALIATORY DISCHARGE</u>[14]

Similarly, Joseph's claim for retaliatory discharge fails because he has not established a

causal connection between his discharge and the filing of the charge of discrimination.  To

support his retaliatory discharge claim Joseph once again directed this Court to examine his

deposition testimony.  The relevant deposition colloquy states as follows:

| | |
|---|---|
| Q: | On your last day of employment when you went into Tolga's office what happened? |
| Joseph: | When I got fired? |
| Q: | When you went into Tolga's office on your last day of employment, what happened? |
| Joseph: | When you meant the last day, is it the last day I worked there when I got fired? |
| Q: | That is the day. |

---

[14]The Parties dispute whether Joseph was terminated from his employment or whether Joseph voluntarily ceased his employment with FTQ by failing to return to work.  However, because the Court finds that Joseph cannot make out a prima facie claim for retaliatory discharge the Court will not resolve this issue.

Joseph:         While I was working I had talked previously to the foreman and then the foreman took the golf cart with me and then we went to the main office.

Q:              Is there more?

Joseph:         Can I continue?

Q:              Please.

Joseph:         I had a folder that had several documents regarding the job. When Lionel now [sic.] took me to Mr. Tolga and started explaining what happened, Mr. Tolga took the folder from me and then he put it there and then he asked me, do you still want to work for this company? And then I said yes, every morning when I come to work is [sic.] to start working here. And then if I didn't want to work I would not bother to come at all. And then he said, okay, you know what? Today I think I'm over with you. You are fired. And then I say, well, if you fire me, I don't have to come back to the company anymore. And then I said, can you pay me and give me now a note that I can go to the Unemployment office? And then he said no. When I started to insist, then he started grabbing the phone to call the police for me. There was another guy there who represented other companies. I was told that he was a general manager but I don't know what he was. I don't even remember his name. And then he put his hand on top of Mr. Tolga's hand and said he, don't do that, don't call the police. I will take care of that. He asked me for my address so he can mail me my check and then at that point I left the work place and then maybe three hours later –

Q:              Let me stop you there. I just want to know what happened in the office. And what happened on July 13th?

Joseph:         It was the last day. I don't remember the date but it was the last day.

Q:              I won't hold you to the date, but it was the last day that you worked there?

Joseph:         Yes, the last day.

Q:              Was there anyone else in the office other than the general manager that you referred to while you were speaking with Tolga?

Joseph:         Lionel was there also because he was the one who took me to the main office.

Q:              What was the reason for going to the office?

-29-

Joseph:       I think I told you that already.  Since I got that position, Silveo refused to
work under me.  Murat, every now and then would go to the office and
spend an hour, two hours there and doesn't come back to work.  He comes
any time he wants.  Sometimes even after 9:00.  And then at that point I'm
the one in charge of everything.  And then everybody else now who
depends on all the saw men, they would come to me and complain.  They
would come to me and say, can you do that for me?  Can you cut that for
me?  But I could not do everything.  That's why I called the foreman and
complained, and the foreman who was after me to get fired because he
wasn't too happy about the promotion that I got and then at the same
moment he said, okay, let's go talk to Mr. Tolga about it.  He is the
foreman.  Why did he have to take me to Mr. Tolga?

Joseph Dep. at 80-83.  In his testimony, Joseph established that his last day of employment was

July 13, 2004, however, he filed his charge of discrimination on November 25, 2003.  Thus,

Joseph was terminated approximately seven months after he filed his charge of discrimination.

Therefore, the Court finds that Joseph has failed to establish temporal proximity between the

filing of his charge of discrimination and his termination.  See Clark County Sch. Dist., 532 U.S.

at  273-274; Higdon, 393 F.3d at 1220-21.  Moreover, Joseph did not present this Court with any

evidence tending to show that his termination had a causal connection with the filing of his

charge of discrimination.  See Opp.  In fact, the only evidence which Joseph relied upon to

support this contention was the above quoted deposition colloquy.  See id.  But that deposition

testimony does not mention or even suggest that his termination was somehow related to the

filing of his charge of discrimination in November of 2003.  In fact, in his testimony Joseph

suggests that his foreman (Lionel) wanted to get him fired because he resented his promotion to

saw man.  See supra 29-30; Joseph Dep. 80-82.  Thus, Joseph failed to present any evidence

tending to show a causal connection between the filing of his charge of discrimination and his

termination.[15]  Therefore, the Court finds that Joseph's claim for retaliatory discharge fails as a

matter of law.  See Higdon, 393 F.3d at 1220.

## V.    CONCLUSION

For the reasons set forth above, it is hereby

ORDERED AND ADJUDGED as follows:

      1.      FQT's Motion for Summary Judgment is GRANTED.

      2.      The Clerk is directed to CLOSE this case.  All pending motions are

            DENIED AS MOOT.

DONE AND ORDERED in Chambers at Miami, Florida, this 6th day of December, 2006.

*Marcia G. Cooke*

MARCIA G. COOKE
United States District Judge

*Copies furnished to:*

*All Counsel of Record*

---

[15]It should be noted that in his opposition brief and deposition Joseph admitted that after he filed his charge of discrimination he received several raises and a promotion to saw man.  See Opp. at 13; Joseph Dep. at 68-69.  While these facts do not resolve the issue of whether Joseph suffered retaliatory treatment after the filing of the charge of discrimination they do seem to undermine Joseph's contention.  In his opposition, Joseph attempts to circumvent these facts by arguing that the raises and the promotion were only given as a means of appeasing the FCHR's pending investigation.  See Opp. at 13.  However, Joseph has not provided this Court with any evidence to support this contention.  See id.  Therefore, the Court cannot give much credence to this argument.